**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-503 (RCL)** |
| **v.** | : | |
| | : | |
| **GLENN ALLEN BROOKS,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Glenn Brooks to 6 months of incarceration followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service and $500 in restitution.

### I.      Introduction

Defendant Glenn Brooks, a 64-year-old former home contractor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Brooks was convicted at trial of four offenses: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 3); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 4). The government's recommendation of six months of incarceration and one year of supervised release is a just punishment for Brooks's criminal conduct. The government's recommendation is supported by Brooks's (1) entering the Capitol building through a broken window with alarms blaring overhead, (2) occupying an office used by Senators, (3) refusing to leave the Capitol despite being directed to do so by police, (4) evincing a lack of remorse, and (5) indicating in text messages that further political violence may be justified. A term of six months of incarceration followed by one year of supervised release reflects the willfulness of Brooks's unlawful conduct and the gravity of his participation in a riot that disrupted the peaceful transfer of power, and it provides an appropriately strong deterrence against engaging in similar conduct in the future.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Statement of Facts summarizing the January 6, 2021 attack).

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Brooks's Role in the January 6, 2021 Attack on the Capitol*

Brooks traveled across the country to participate in the events of January 6, 2021 in Washington, D.C. On January 2, 2021, Brooks flew from his home in Southern California to Virginia, and on January 5, he drove to Alexandria, Virginia. On January 6, Brooks traveled into Washington, D.C. and attended former President Donald Trump's "Stop the Steal" rally. *See* Image 1. Brooks was present when Trump called upon Vice President Mike Pence to decline certification of the election results.



***Image 1: Brooks at the "Stop the Steal" rally on Jan. 6, 2021 during former President Trump's speech (Gov't Ex. 306)***

After Trump's speech, Brooks walked towards the Capitol. At 2:23 p.m., Brooks took a "selfie" photograph walking down the middle of Pennsylvania Avenue from the White House area. *See* Image 2.



***Image 2: Brooks walking down Pennsylvania Avenue toward Capitol at 2:23 p.m.***

At approximately 2:48 p.m. Brooks reached an area near the Peace Circle monument northwest of the Capitol and breached a restricted perimeter previously secured with metal bike racks and snow fencing. He photographed rioters using toppled bike racks as makeshift ladders to scale low stone walls lining the Capitol grounds. *See* Image 3. This showed that he both saw fencing marking the area closed to the public and witnessed bike racks being used by rioters as instruments to trespass into the restricted areas.



*Image 3: Brooks's photograph of rioters using bike racks to scale a wall*

Brooks then crossed the northwest portion of Capitol grounds toward the Capitol building where he saw rioters amassed on the Upper West Terrace above him. He reached the elevated terrace by circling around the north end of the building, crossing over a short footbridge, passing through an overwhelmed security checkpoint, and then then doubling back to the west side of the building along the Upper West Terrace. At 3:10 p.m., he stood against the terrace railing and photographed the area below where he had approached the building 20 minutes earlier.



***Image 4: Photo taken by Brooks on the Upper West Terrace at 3:10 p.m.***

At 3:13 p.m., Brooks found a way into the Capitol building. From the Upper West Terrace, he walked alone toward the Senate Wing Door, paused briefly as he observed the situation at the breach point, and then briskly continued forward to the entrance. When he approached the Senate Wing Door, the doorway itself was already ajar after having been kicked open an hour earlier by rioters, triggering a loud alarm in the entryway. Rioters had shattered the glass in the door's small window, and they had also shattered the large windows to the left and right of the door. Brooks chose to enter the building by crawling through the north window, stepping over broken glass and ignoring the alarm blaring overhead.



***Image 5: Brooks crawling into the Capitol building at 3:13 p.m. through a window adjacent to the Senate Wing Door***

Once inside, Brooks moved into the center of the room as he took photos and videos of the siege he had joined. He then moved deeper into the Capitol, heading down a hallway toward the center of the building. After entering the hallway—where several police officers were attempting to move rioters toward the exit—Brooks turned into a small "hideaway" office where other rioters had gathered.

As Brooks entered the hallway and then the hideaway office, he passed by Dennis Kelly, then a U.S. Capitol Police Lieutenant defending the building. Shortly after Brooks entered the office, Lt. Kelly turned and entered the hideaway office after Brooks. As Lt. Kelly testified at trial, he told the rioters present in the office, who included Brooks, that they needed to exit the Capitol building.

Instead of exiting the Capitol as directed by Lt. Kelly, Brooks instead turned left out of the hideaway office and continued deeper into the Capitol before turning right into another office. At the time, several police officers were in the area clearing rioters from that second office, and

Brooks quickly exited the room and returned to the Senate Wing Door area. Even as he approached

the exit and saw officers guiding others out, Brooks avoided exiting the Capitol. Instead, he walked

to the corner of the room and stood against the wall as police worked to clear the crowd from the

room. For more than 10 minutes, Brooks stood texting and taking pictures on his phone as he

watched police lead other rioters out of the building. During this time, at 3:25 p.m., he took a

picture of himself smiling with the rioters behind him.



*Image 6: Photo taken by Brooks inside Senate Wing Door entryway at 3:25 p.m.*

At 3:31 p.m., Brooks exited the Capitol building, but he remained for long afterwards on

the Upper West Terrace—still well within the restricted perimeter. Brooks understood the purpose

of the siege, sending a text message at 3:36 p.m. stating: "they're talking about holding the Capitol

to stop the certification tonight." At 3:46 p.m., when another rioter began yelling at the crowd through a megaphone to "move forward," Brooks walked with other rioters back toward the Senate Wing Door, which police officers had by that time re-secured. Brooks remained with the other rioters on the Upper West Terrace for at least another 40 minutes, prolonging the siege.



*Image 7: Brooks remaining on Upper West Terrace after exiting Capitol building*

*Post-January 6 Statements by Brooks*

After his participation in the siege of the Capitol, Brooks sent text messages suggesting that further political violence or vengeance would be justified. On January 9, 2021, Brooks texted, "We would rollover any enemy cacing [sic] patriots. Not only do we have moral high ground, but we are tougher and more tenacious if you wake us from the slumber..oh yeah we are the 2nd Amendment side with guns and tactics." On January 14, 2021, Brooks texted: "Keeping the faith but struggling with call of patriotism. This country is on brink of utter loss. We were founded as a light on a hill by a bunch of evangelicals…a day of visitation then. We need a day of visitation now & if we get one..heaven help those poor bastards."

*The Charges and Trial*

On August 3, 2021, the United States charged Brooks in a four-count Information with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §

9

1752(a)(1) (Count 1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 3); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 4). On May 14, 2024, a jury found Brooks guilty of the four counts charged in the Information.

### III.    Statutory Penalties

Brooks now faces sentencing on all four counts of conviction. Brooks faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000 on Counts One and Two (18 U.S.C. §§ 1752(a)(1) and (2)), and an additional six months of imprisonment and fine of up to $5,000 on Counts Three and Four (40 U.S.C. §§ 5104(e)(D) and (G)). Brooks may also be ordered to pay restitution.

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The U.S. Probation Office calculated Brooks's criminal history as a category I. ECF No. 145 (final PSR) at ¶ 47. Accordingly, the U.S. Probation Office calculated Brooks's total adjusted

offense level at 8, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 92.

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a))[2] | 10 |
| Zero-Point Adjustment (U.S.S.G. § 4C1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **8** |

*See* PSR at ¶¶ 26-44. While the Government concedes that Section 4C1.1 may apply to Brooks, the Court should vary upward by two levels to account for this reduction under 4C1.1. In the context of January 6 cases, courts have routinely found that an upward variance in response to a 4C1.1 reduction is justified by considerations made relevant by 18 U.S.C. § 3553(a). *See United States v. Kelly*, 21-cr-708 (RCL), 2024 WL 756642, at *7 (D.D.C. Feb. 23, 2024) ("[I]f the guidelines range applicable at sentencing had been lower [as a result of a 4C1.1 reduction] … the Court likely would have varied upwards to impose a higher sentence because only a higher sentence would have sufficed to effectuate the purposes of punishment set forth in the 18 U.S.C. § 3553(a) factors."); *United States v. Bauer*, 21-cr-3862 (TNM), 2024 WL 324234, at *5 (D.D.C. Jan. 29, 2024) (same); *United States v. Williams*, 21-cr-618 (ABJ), 2024 WL 1239989, at *7

---

[2] The Probation Office determined that Counts One and Two should be grouped under U.S.S.G. § 3D1.2(b) before calculating the overall offense level taken from Count Two, based on Count Two having a higher offense level than Count One and therefore providing the offense level for the group under U.S.S.G. § 3D1.3.  PSR at ¶¶ 33-34. The government calculates the guidelines for each offense as follows:

First, for Count One:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Trespass "at any restricted buildings or grounds" (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Total Adjusted Offense Level for Count One | 6 |

For Count Two:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Total Adjusted Offense Level for Count Two | 10 |

(D.D.C. Mar. 22, 2024) (same); *United States v. Eicher*, 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field."). By climbing through a broken window, occupying an office in the Capitol, and refusing to immediately follow police directives to leave, Brooks helped prolong the siege of the Capitol and delay the certification of the 2020 election. Brooks's conduct caused a significant disruption to a vital governmental function, warranting an upward variance.

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g., United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is

accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of six months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F. Supp. 3d 1, 8 (D.D.C. 2021)*.* While assessing Brooks's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Brooks, the absence of violent or destructive acts is not a mitigating factor. Had Brooks engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Brooks's case is the willful and overt unlawfulness of his conduct. Brooks knew he did not have the authority to crawl into the U.S. Capitol building through a broken window. No one pressured him to do so. Nothing blocked him at any point from voluntarily leaving Capitol grounds the way he came. But Brooks willfully walked across the Capitol grounds, found a way onto the Upper West Terrace and into the Capitol building—all

because he wanted to help "hold" the Capitol to block Congress from certifying the election. *See* Statement of Judge Lamberth at sentencing, *United States v. Kelly*, 21-cr-708 Tr. 8/18/2023 at 22 ("There's blaring alarms as you go in the building. And yet, you persist in that. And the result of people going in the building like that is it brought the government to a screeching halt, so you are actually obstructing the government from being able to go forward with its function, and it brought the whole government to a halt."). Brooks deliberately joined in an anti-democratic effort to block the peaceful transfer of power. In the wake of the attack, even after seeing what he described to one person as the "carnage" that unfolded that day, he downplayed the violence to others and discussed the prospect of turning himself in to gain a national platform. Accordingly, the nature and the circumstances of this offense warrant a sentence of incarceration.

### B. Brooks's History and Characteristics

Unlike many defendants who appear before the Court for sentencing, Brooks had a stable upbringing, possesses multiple college degrees, and at the time of his criminal acts, operated a successful business and owned a home in southern California. Brooks was driven to participate in the siege of the Capitol not by desperate circumstances, but by the egregious, undemocratic intent to disrupt a core proceeding in our democracy's election process. As provided in the final PSR, Brooks was provided with release-of-information forms prior to a presentence interview with Probation, but did not return the forms prior to the issuance of the final PSR. PSR ¶ 52. Therefore, independent verification requests could not be forwarded to former schools, employers, or medical providers.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (Statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 21-cr-41 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Given Brooks's contribution to the siege of the Capitol, this Court must impose a sentence that deters Brooks from future criminal conduct. As this Court has noted in cases involving other

January 6 defendants, Brooks's choice to climb through a window with blaring alarms overhead disrupted the certification of the 2020 election.

Brooks's lack of remorse or acceptance of responsibility for his criminal conduct on January 6 is also concerning, especially when coupled with his communications afterwards suggesting that *further* political violence may be justified. On January 9, 2021 Brooks texted, "We would rollover any enemy cacing [sic] patriots. Not only do we have moral high ground, but we are tougher and more tenacious if you wake us from the slumber..oh yeah we are the 2nd Amendment side with guns and tactics." As this Court has made clear in another January 6 case, Brooks's sentence should convey to him that participating in political violence is criminal and a threat to American democracy. *See* Statement of Judge Lamberth at sentencing, *U.S. v. Johnatakis*, 21-cr-91 Tr. 4/3/2024 at 5 ("There can be no room in our country for this sort of political violence. The Framers designed our constitutional system so that the people govern through their representatives, according to law. Decisions are the result of elections, debates, and compromise. The people, through their representatives, decide. By contrast, those who think political ends justify violent means seek to replace persuasion with intimidation, the rule of law with "might makes right." Violence risks begetting a vicious cycle that could threaten cherished conventions and imperil our very institutions of government. In that sense, political violence rots republics.").

In a lengthy, disjointed statement to Probation included in the final PSR, Brooks disputes the jury's verdict as to all counts, disclaims responsibility for his unlawful conduct on January 6, and continues to evince little remorse for his own actions. In a claim that is remarkable only for its lack of plausibility, Brooks even equates climbing through a smashed window in the nation's Capitol while alarms blared to routine construction work. Such denial only provides further support for the recommended sentence of incarceration.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Brooks in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Brooks based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Brooks has been convicted by a jury of Counts One through Four (in violation of 18 U.S.C. §§ 1752(a)(1), 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (G)). Counts One and Two are Class A misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply here.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In considering the sentences of Capitol breach defendants, judges place special emphasis on defendants who ventured into sensitive spaces within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most infamous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, and an attempted display of power, above and beyond entering the building.

In *United States v. Billy Knutson*, 22-cr-31 (FYP), Knutson—like Brooks—climbed through a broken window next to the Senate Wing Door to make illegal entry into the Capitol on January 6, 2021. Judge Pan sentenced Knutson to six months' incarceration and 12 months' supervised release. Though Knutson did not engage in violence himself, he witnessed events in the same area that Brooks occupied-including officers telling rioters to leave—and remained there for several minutes before exiting when told to do so through the Senate Wing Doors. Brooks, instead of remaining only a few minutes, went further into the Capitol into the Senate hideaway office, a sensitive area used for official Senate business. While Knutson was more vocal during his time inside the Capitol, both Knutson and Brooks made statements after January 6, 2021

doubling down on their view of the good choices they made that day. Rather than go through a trial, Knutson pled guilty to one count of 18 U.S.C. § 1752(a)(1).

In *United States v. Isaac Yoder*, 21-cr-505 (RCL), another trial with identical convictions under Counts One through Four, this Court sentenced the defendant to 12 months' incarceration. Yoder entered through the Senate Wing Door itself (rather than a window) with a sword, but also climbed on furniture once inside and yelled to rouse other rioters as well.  Yoder and Brooks were in the Senate Wing Door area at the same time, and Yoder can be seen in the background of several exhibits from Brooks's trial. Though Yoder was more vocal than Brooks both during the siege and in his statements during and after the trial, the sentiment from Brooks is so far the same: Both saw themselves as individuals who acted with courage that day and are proud of their actions. Even taking into account the more muted participation of Brooks at the Senate Wing Door, the similarities to Yoder warrant at least a six-month period of incarceration for Brooks.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Brooks was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v.*

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation'

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Brooks to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Brooks's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The defendant's convictions for violations of 18 U.S.C. §§ 1752(a)(1) and (2) subject him to a statutory maximum fine of $100,000 for Counts One and Two and a maximum fine of $5,000 for Counts Three and Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $2,000 to $20,000. U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Brooks to six months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Brooks's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Hutton Marshall*
J. HUTTON MARSHALL
VICTORIA A. SHEETS
Assistant U.S. Attorneys
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov