UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

GLENN ALLEN BROOKS

Case No. 21-cr-503 (RCL)

# GLENN BROOKS'S MEMORANDUM IN AID OF SENTENCING

*'For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in, [36] I needed clothes and you clothed me, I was sick and you looked after me, I was in prison and you came to visit me.'*

*[37] "Then the righteous will answer him, 'Lord, when did we see you hungry and feed you, or thirsty and give you something to drink? [38] When did we see you a stranger and invite you in, or needing clothes and clothe you? [39] When did we see you sick or in prison and go to visit you?'*

*[40] "The King will reply, 'Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.'*

*Matthew 25, 35-40*

"I have watched him befriend a homeless man and give him positive direction."
Ex. 1, Letter from Dr. Timothy Erickson

"Glenn is a special person because he is willing to go to Haiti and help."
Ex. 2, Letter from Joseph Thinn

"One of the things that I have observed and that I admire about Glenn is his heart and compassion for people in low places."
Ex. 3, Letter from Pastor Anthony Onorato

1

"Mr. Brooks is a delightful person, a good friend, and a trustworthy individual who spends his time finding ways to help others."
Ex. 4, Letter from Dr. Omer Shedd

"Our experience with Mr. Brooks is that of a devoted Christian, a great humanitarian devoting part of his time to help the needy and disadvantaged. "
Ex. 5, Letter from Dr. Guy Theodore

"I have witnesses Mr. brooks to be a man of impeccable character, integrity, and a man seeking to follow the example of Jesus by loving people, by serving people, and by being obedient to the precepts of Christ."
Ex. 6, Letter from Daniel Mattson

"Glenn is a calm, kind and compassionate man that never hesitates to show up if someone needs him."
Ex. 7, Letter from Manuel Conchinha

"Glenn has always been sort of a hero to me… I was in awe of the love, kindness and patience he gave the kids… Glenn has a servant's heart and is always there to help when he can."
Ex. 8, Letter from Marilyn Kahaunaele

"Mr. Brooks has a very passionate heart for helping others.  He has helped not only people from our church but also went as a volunteer around the US and other countries after disaster struck."
Ex. 9, Letter from Nadia Thinn

"I urge you to consider Glenn as a man of integrity, kindhearted. Gentle spirited, wonderful Christian, servant to all he meets unselfishly helping others."
Ex. 10, Letter from Tom Talley

"…he is a kind man with a long record of helping others."
Ex. 11, Letter from Mark Ziminski

Mr. Glenn Allen Brooks will be before the Court for sentencing on September 13, 2024, having been convicted in a jury trial for his conduct at the U.S. Capitol on January 6, 2021. Mr. Brooks has been on pretrial release for over three years, complying fully with all conditions. Mr. Brooks came to Washington, D.C. to support President Trump, who told his followers on that day that the election results were incorrect, that this created a national security threat, and that his supporters should go to the Capitol to urge Senators and Vice President Mike Pence to take what he described as lawful steps provided for under the Constitution to correct the election results. Mr. Brooks is a deeply religious man, who follows his faith and believes he was called on January 6, 2021 to attend the Trump rally, to witness the events of that day, and to be present should God manifest himself in some form on that day. Mr. Brooks strongly believed that God was at work through then-President Trump and that God would make himself known that day. Mr. Brooks traveled with the crowd from President Trump's Stop the Steal rally to the U.S. Capitol.  He entered the building and walked around briefly in the hallways near where he entered.  While in the building, he did not engage in any violence, he did not taunt or insult police, he did not damage property, he did not encourage others to engage in violence, and he did not celebrate violence.

Mr. Brooks is 64 years old, a loving father, a dedicated missionary, and a man of enormous faith and commitment to God. His decision to attend the Stop the Steal rally and follow the crowd to the U.S. Capitol is not an accurate reflection of his character. A sentence of 24 months' probation with community service and $500 in restitution is sufficient, but not greater than necessary, to achieve the purposes of punishment.

## **BACKGROUND**

Mr. Brooks has now been under community supervision for over thirty-six months. During that time, Mr. Brooks has demonstrated that he is without question a person who can

succeed on supervision and who will abide by any conditions set by the Court. For over three years, he has maintained strict compliance with his conditions of release. The Court has repeatedly permitted Mr. Brooks to travel to Haiti and Ghana on mission trips intended to assist communities in becoming more self-sustaining from an energy perspective. Mr. Brooks maintained contact with his pretrial officer; focused on employment and his faith; and, importantly, had no contact with law enforcement.

Mr. Brooks's faith and his commitment to helping others is demonstrated not only through is work abroad, but in his actions at home. As Ms. Gina Staszewski describes in her letter, Mr. Brooks uses his skills as a contractor to help "single women and widows with home repairs." Ex. 12, Letter of Gina Staszewski. He also volunteers with Habitat for Humanity.

Mr. Brooks behavior on January 6, 2021 was completely at odds with who he is as a person and he has expressed his regret and disappointment in his actions to his friends. *See* Ex. 12, Letter of Gina Staszewski ("We have become friends and he has spoken about the January sixth incident. He has not indicated any malaise or anger but only regret and disappointment in the incident.").

Mr. Brooks made the decision to come to Washington, D.C. and support President Trump. Mr. Brooks traveled with his sister and a friend. They arrived on January 5, 2021 and spent the evening at a prayer vigil and visiting some of the monuments. The following day, Mr. Brooks went to the Stop the Steal rally. The rally was crowded and people were energetic. As a deeply religious man, Mr. Brooks recognizes God's work and intentions all around him and he felt like he was surrounded by like-minded individuals who were there to support Trump, but also to witness God's hand that day. As Chris Jacobson explains in his letter, Mr. Brooks "told us that he was in DC in January 2021 because he believed God was doing a work through

4

Donald Trump and that he just wanted to be there to witness it. Knowing Glenn as I do, I have no reason to disbelieve him." Ex. 13, Letter of Chris Jacobson. Mr. Brooks's belief that God was working through then-President Trump drove his actions on January 6, 2021.

After the speech, Mr. Brooks, like many individuals, followed the crowd. He followed others to the Capitol, eventually entering the building and wandering briefly down a hallway before returning to the area where he entered and standing in the corner for about 11 minutes. Mr. Brooks committed no violence, encouraged no violence, committed no vandalism and encouraged no vandalism. After he left the building and stayed outside the building for a while and eventually left the Capitol to return to his hotel prior to the curfew.

## ARGUMENT

### I. Legal Standard

As a Maryland District Court aptly explained, "[t]he sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in a prison cell." *United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020). And, "[f]or him, every day, month and year that was added to the ultimate sentence will matter. The difference . . . between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family." *Id*.

This concern exists "whether it is the newly incarcerated individual's first experience with incarceration or just the most recent," because regardless, "he must quickly adapt to the stunning loss of freedom and privacy while struggling to maintain any sense of his personal

dignity." *Id*. Thus, the court continued, "it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Id.*

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the need to avoid unwarranted disparities. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "*sufficient, but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

The Court must "make an individualized assessment," considering the factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). *Booker* and § 3553(a) require the Court to tailor an individualized sentence that achieves § 3553(a)'s objectives in the case before it. *See Rita v. United States*, 551 U.S. 338, 348, 350 (2007). "'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

## II. The United States Sentencing Guidelines

The Guidelines range under 2A2.4, giving Mr. Brooks credit for being a zero point offender under 4C1.1, is 0-6 months incarceration, in Zone A. Although still advisory only, the Guidelines manual itself authorizes a probationary sentence when the Guidelines range is in Zone A, as it is here. *See* 5B1.2, Application Note 1(A).

Additionally, Mr. Brooks's status as a zero-point offender demonstrates a significantly lower possibility of recidivism. Sentencing Commission data analyzing recidivism rates shows that individuals, like Mr. Brooks, with zero criminal history points[1] have considerably lower recidivism rates, including lower recidivism rates than individuals with only one criminal history point. *See* United States Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* (Sept. 2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf. The Commission found that just over one-quarter (26.8%) of individuals with zero criminal history points were rearrested. *Id*. at 26. The rearrest rate of zero-point individuals was significantly lower than individuals with just one criminal history point, of which 42.3% were rearrested. *Id*. The fact that Mr. Brooks has no prior criminal history makes him statistically less likely to reoffend or be rearrested. The low likelihood of rearrest supports a finding that a sentence of probation is

---

[1] Mr. Brooks has no prior juvenile or adult convictions, therefore, had the Sentencing Guidelines applied, he would have zero criminal history points.

sufficient, but not greater than necessary, to satisfy the purposes of punishment including providing adequate deterrence and protecting the public.[2]

The upcoming amendments to the Sentencing Guidelines also stress the appropriateness of a sentence other than imprisonment "in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." United States Sentencing Commission, *Amendments to the Sentencing Guidelines* at 80 (April 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.  The upcoming amendments add a comment to Guideline § 5C1.1 indicating that a sentence other than imprisonment is "generally appropriate" for first-time offenders or zero-point offenders, who fall into Zone A or B on the sentencing table.  The policy justifications for recommending non-incarceration sentences for first-time or zero-point offenders whose guidelines range does not exceed 15 months (the top of any Zone B range) is directly applicable here.  As a first-time offender, who has not committed a crime of violence or otherwise serious offense, a sentence of incarceration would be greater than necessary to satisfy the purposes of punishment.

### III. Imposing a Sentence of Probation is Sufficient, But Not Greater Than Necessary, to Comply with § 3553(a).

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing.  *See* 18 U.S.C. § 3553(a) (emphasis added).  Honest application of the federal sentencing statute

---

[2] The Sentencing Commission report also found that "[f]ewer than one third (29.3%) of offenders sentenced to probation were rearrested[; and o]ffenders sentenced to a probation term of any length had lower rearrest rates compared to offenders sentenced to prison." *Id*. at 36.

confirms that a sentence of 24 months' probation and $500 restitution is sufficient but not greater than necessary to meet the goals of sentencing.

      A.      **Mr. Brooks's History and Characteristics**

Mr. Brooks is 64 years old. He grew up in California and has two sisters. His mother currently lives in North Carolina with one of his sisters, but Mr. Brooks visits often and takes a significant role in caring for his mother as she ages. See Ex. 8, Letter of Marilyn Kahaunaele ("He's very attentive to his mother, giving her time, attention, and Love."). Not only is he a cherished son and brother, but he is a dedicated father. While he has 5 biological children, he has been a father to 7, all of whom adore him and have grown into law abiding, contributing members of society.

Mr. Brooks currently lives in Florida and works as a contractor. However, his passion is in helping others and the non-profit that he started to help people in Haiti (and now Ghana) develop sustainable energy alternatives. *See* Ex. 14, Letter of Roger Sands ("[Mr. Brooks] has been working on a project that extracts oil out of a particular type of plant. This oil can be used for energy. His hopes are that he can develop a way that the local Haitian people can grow the specialized plant, extract the oil and then benefit from what it provides."). He also assists a hospital in Haiti "that serves a very poor and rural community." Ex. 14, Letter of Roger Sands. Mr. Brooks "played a major part in the design and installation of a solar panel system that effectively supplies the whole hospital with electricity." *Id*.

As discussed above, Mr. Brooks has no criminal record and the events of January 6 are an aberration in his life and character. He has expressed his regret that he went into the Capitol on January 6 to friends and family. *See* Ex. 10, Letter of Tom Talley ("Glenn has discussed his case with us and with me personally. He in hind sight realizes entering the Capitol was not a wise decision however, in the moment seeing everyone walking in figured it was maybe something

9

that spontaneously developed allowing them to go inside."). His success on pretrial release demonstrates that he can live a law-abiding life, as he has for his entire life aside from the events of January 6. Mr. Brooks's history and characteristics demonstrate that incarceration is not necessary to satisfy the purposes of punishment in this case.

### B. The nature and circumstances of Mr. Brooks's offense

After the presidential election, former President Trump, members of his inner circle and some members of the media began circulating the word that the election was "stolen." The false claims spread on media—from local news outlets, to Facebook, to some national broadcasts—that the election had been corrupted.[3] Like tens of millions of other Americans, Mr. Brooks was a supporter of President Trump. He was not affiliated with—nor did he support—any extremist organizations and he is opposed to violent action. When President Trump started advertising the

---

[3] The false claims spread on media—from local news outlets, to social media, to some national broadcasts, that the election had been corrupted. For example, one news source stated that Texans should be wary of voting by mail in the 2020 election because mail in ballots are "ripe for fraud and abuse." Robert Montoya, *Are Texas Elections Secure?*, Texas Scorecard (Nov. 6, 2020), https://texasscorecard.com/state/are-texas-elections-secure/. *See, e.g.*, Tucker Higgins & Kevin Breuninger, *Texas sues for battleground states in Supreme Court over 'unlawful election results' in 2020 presidential race*, CNBC (Dec. 9, 2020), https://www.cnbc.com/texas-sues-four-battleground-states-in-supreme-court-over-unlawful-election-results.html (reporting on Texas lawsuit filed after the 2020 election which argued that the election results in Pennsylvania, Georgia, Wisconsin, and Michigan . . . should be declared unconstitutional based on the states' use of the COVID pandemic to change their election outcomes); Donald Trump (@realDonaldTrump), *Twitter*, (Dec. 9, 2020, 8:39 AM), https://twitter.com/realDonaldTrump/status/trump-tweets-his-campaign-will-join-paxsons-election-suit (Mr. Trump tweeted in support of the above Texas lawsuit contesting the election results in battleground states, stating that the lawsuit was "very strong, [with] ALL CRITERIA MET. How can you have a presidency when a vast majority think the election was RIGGED?"); Kate McGee, Texas *Republicans decline to condemn President Trump's premature declaration of victory while votes are still being counted*, The Texas Tribune (Nov. 4, 2020), https://www.texastribune.org/texas-republicans-trump/ (reporting how many Texas republicans, including Senator Ted Cruz, Senator John Cornyn, and Governor Greg Abbott, were silent on the matter of "Donald Trump prematurely and falsely [declaring victory]" in the 2020 election and U.S. Rep. Jodey Arrington stating that "there are legitimate concerns regarding the potential for fraud [in the election] that must be addressed in order for the country to move forward").

10

"Stop the Steal" rally, Mr. Brooks decided to attend to protest the election and show his support for then-President Trump.

When he traveled to the "Stop the Steal" rally, Mr. Brooks intended to protest the election and support Mr. Trump. While the events that unfolded on January 6 have been labeled "an insurrection," Mr. Brooks did not attend the rally intent on overturning the government. He attended to show his support for President Trump. The rally was exciting and the crowd was very energetic. After the rally, Mr. Brooks followed the crowd to the Capitol where he believed they were going to continue to protest and Mr. Brooks believed that God would manifest himself. As discussed above, Mr. Brooks strongly believes that God was working through President Trump and that God would make his presence and will known on January 6, 2021. Mr. Brooks was committed to being present and experiencing this manifestation of God.

When Mr. Brooks arrived at the Capitol, the Upper West Terrace Door was open and the windows were already broken. He witnessed many people entering the building through the doors and windows. Although he now recognizes entering the building was not appropriate and certainly entering through a window was inappropriate, at the time, he was following the crowd and walking through a window was not abnormal to him, as he worked on many construction sites in the past. Mr. Brooks followed others through the window, into the building, and briefly down a hallway. After a few moments, he turned around and went back to the entryway near the Upper West Terrace Door. He stood in a corner for approximately 11 minutes before leaving the building. Mr. Brooks spoke politely with an officer at one moment, but otherwise did not engage at all with officers that day. Mr. Brooks was not violent, aggressive, destructive, or even loud on January 6, 2021. Mr. Brooks did not steal or vandalize any object within the Capitol. He did not wear combat gear or carry any weapons. He did not engage in any violence towards law

enforcement nor did he taunt members of law enforcement.  Unlike many others present on January 6, Mr. Brooks did not celebrate or glorify the violent actions of others in the days after January 6.  A probationary sentence is sufficient, but not greater than necessary, to account for the nature and circumstances of Mr. Brooks's offense.

### C. The need for the sentence imposed to satisfy the purposes of punishment

A sentence of probation, community service, and restitution is sufficient, but not greater than necessary to satisfy the purposes of punishment.  As stated above, Mr. Brooks's status as a first-time offender is significant and a sentence of incarceration is not necessary to deter Mr. Brooks or protect the public from future crimes.  Mr. Brooks's success on pretrial release and lack of interactions with law enforcement over the past 36 months demonstrates that his actions on January 6, 2021 were an aberration and that he has returned to his law-abiding life.

Additionally, an incarceration sentence is not necessary for specific deterrence.  Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016) (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions").

### D. The need to avoid unwarranted sentencing disparities

While Mr. Brooks's conduct was serious, probation remains an appropriate resolution as it is well within the guidelines and would not result in disparity.  Other individuals who engaged

in similar conduct as Mr. Brooks and chose to proceed to trial have been sentenced to probation. *See, e.g., United States v. Stephen Horn*, No. 21-301 (TJK) (12 months' probation, jury trial convicted on four misdemeanors); *United States v. Karol Chwiesiuk and Agnieszka Chwiesiuk*, No. 21-536 (ACR) (both defendants sentenced to 36 months' probation, 90 days home detention, jury trial convicted on four misdemeanors); *United States v. Nancy Barron*, No. 22-89 (ZMF) (36 months' probation, 90 days home detention; jury trial convicted of four misdemeanors).

Many cases with similar conduct have resulted in non-incarceration sentences. *See, e.g., United States v. Tyler Tew*, No. 22-27 (RMM) (24 months' probation, plead guilty to four misdemeanors); *United States v. Jonathan Bonney*, No. 24-17 (APM) (12 months' supervised release; plead guilty to four misdemeanors); *United States v. Jeffrey Witcher*, No. 21-235 (RC) (12 months' probation with community service; plead to one count of 1752(a)(1)); *United States v. Steven Billingsley*, No. 21-519 (TFH) (24 months' probation; plead guilty to 1752(a)(2)); *United States v. Michael Greene*, No. 21-28 (APM) (24 months' probation; plead guilty to 1752(a)(1)); *United States v. Michael Gianos*, No. 22-74 (JMC) (24 months' supervised release; 30 days home detention; plead guilty to 1752(a)(1)); *United States v. Nicholas Lentz*, No. 22-53 (RDM) (30 days home detention; 36 months' probation; plead to one count of 1752(a)(1)); *United States v. White*, No. 23-360 (DLF) (60 days home detention; 24 months' probation; plead to one count of 1752(a)(1)).

Alternatively, some courts have sentenced individuals to brief incarceration sentences. See, e.g. *United States v. David John Lesperance, Casey Cusick, James Cusick Jr.*, No. 21-575 (JDB) (all three defendants received 10 days' incarceration, 24 months' supervised release; jury trial); *United States v. Lawrence Dropkin*, No. 21-734 (JEB) (30 days incarceration, 12 months supervised release, plead guilty to four misdemeanors); *United States v. Christopher Price*, No.

13

21-719 (JEB) (45 days' incarceration, 9 months' supervised release; bench trial); *United States v. Eicher*, No. 22-38 (BAH) (2 months' incarceration; 12 months' supervised release; jury trial). However, Mr. Brooks's personal history and characteristics, including the many good works he does in his community and in Haiti and Ghana, differentiate him from those who have receive incarceration, justifying a non-incarceration sentence without the concern of creating unwarranted sentencing disparities.

A sentence of probation with community service is sufficient, but not greater than necessary, to achieve the purposes of punishment and will not result in unwarranted sentencing disparities.

## CONCLUSION

For the foregoing reasons, and such others as may be presented at the sentencing hearing, Mr. Brooks respectfully requests that the Court impose a sentence of 24 months' probation and $500 restitution.

                                                  Respectfully submitted,

                                                  A. J. Kramer
                                                  Federal Public Defender

                                                  */s/Alexis Gardner*
                                                  Alexis Gardner
                                                  Diane Shrewsbury
                                                  Assistant Federal Public Defenders
                                                  625 Indiana Avenue, N.W., Suite 550
                                                  Washington, D.C.  20004
                                                  (202) 208-7500